## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **HENRY WILLIS, JR** | **CIVIL ACTION** |
| **VERSUS** | **NO. 14-811** |
| **MCDONOUGH MARINE SERVICE, ET AL.** | **SECTION "B"(5)** |

### ORDER AND REASONS

**I.   NATURE OF MOTION AND RELIEF SOUGHT**

Before the Court is Defendants', Marmac, LLC d/b/a McDonough Marine Service ("McDonough Marine") and TETRA Applied Technologies, LLC ("TETRA"), Motion for Summary Judgment (Rec. Doc. 38), which seeks dismissal of Plaintiff Henry Willis Jr.'s claims under the LHWCA, to the extent no genuine issues of material fact exist and Defendants have established as a matter of law that they bore no duty to Plaintiff under the facts of the instant case. Plaintiff opposes the motion and argues issues of fact sufficient to prevent summary judgment exist as to application of the LHWCA and his *Sieracki* seaman" status (Rec. Doc. 41). Defendants have filed a Reply (Rec. Doc. 48).

Also before the Court is Plaintiff's "Motion for Leave to File his Second Amended Complaint" (Rec. Doc. 43), in which he seeks leave to clarify assertion of his seaworthiness claim. Defendants oppose the motion. (Rec. Doc. 50)." For the reasons that follow, **IT IS ORDERED THAT** Defendants' Motion for Summary

Judgment (Rec. Doc. 38) is **GRANTED** and Plaintiff's Motion for Leave to Amend (Rec. Doc. 43) is **DENIED**.

## II. FACTS AND PROCEDURAL HISTORY

This action arises out of an incident, on August 16, 2013, in which Plaintiff was injured after he tripped and fell on a temporary stair set used to access an offshore module placed on the barge Marmac 23, which vessel was owned by Defendant McDonough Marine and bareboat chartered to Defendant TETRA. (See Rec. Doc. 1). At the time of the incident, Plaintiff was employed by non-party Omega Natchiq as a painter/sandblaster. The subject module was owned by non-party Poseidon and was being prepared for ultimate transport to an offshore platform also owned by Poseidon.

The facts are essentially undisputed between the parties.[1] Defendant TETRA bareboat chartered the Marmac 23 in order to perform under a Transportation Agreement, dated March 12, 2013, with Poseidon to transport the 900-ton module from Omega's facility at the Port of New Iberia, where it was being prepared and assembled, to Poseidon's offshore platform. (See Rec. Doc. 38-1 at 2).

---

[1] (See Rec. Doc. 41 at 1) (Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment)("The underlying facts of this matter are virtually undisputed. The effect of those facts as to the mixed questions of law and fact remain highly contested. For the convenience of the Court, Plaintiff will attempt to cite to Defendants' Motion/Exhibits for factual recitation.")

Defendant TETRA delivered the Marmac 23 to Omega's facility, where it was moored into a slip and awaited loading of the module destined for the offshore platform.[2] (See Rec. Doc. 38-2 at 4). At the time of delivery, the record reflects that the barge was bare and did not contain any temporary stair set. (See Rec. Doc. 38-2 at 6).

Plaintiff was hired by Omega in April 2013, approximately four months before the subject incident. (Rec. Doc. 38-2 at 4). Plaintiff initially performed sandblasting/painting work on the subject module in Omega's land-based "blast yard." (Rec. Doc. 38-2 at 4). However, approximately one week before Plaintiff's injury, the module was placed on the Marmac 23, where Plaintiff continued to perform work on it. (Rec. Doc. 41-5 at 4). Although the record provides no indication as to when, or by whom, a temporary stair set was placed on the Marmac 23 to facilitate access to the upper portions of the module.

On August 16, 2013, after completing work on the module for the day, Plaintiff was attempting to descend the temporary stair set to reach the deck of the Marmac 23 and ultimately exit the barge to land. (Rec. Doc. 38-2 at 5. Near the top of the stair set, however, his foot caught a piece of grating, he tripped, and fell while carrying approximately 45 pounds of gear and equipment. (Rec. Doc. 38-2 at 5). Plaintiff sustained numerous

---

[2] Record evidence indicates a third-party tug service, Crosby, was employed for purposes of delivering the barge. (See Rec. Doc. 48-1 at 32).

injuries through this fall, which form the basis of the instant suit.

## III. CONTENTIONS OF MOVANT

Defendants argue there is no record evidence to suggest that either McDonough Marine or TETRA owned the stair set on which Plaintiff was injured or that either of those parties was responsible for its placement on the barge. Absent privity of ownership, Defendants argue, the stair set may not be considered an appurtenance of the vessel such that Defendants would be liable for injuries caused thereby. Further, Defendants argue Plaintiff has presented no evidence that either Defendant breached any of the limited so-called *Scindia* duties, applicable to workers under the LHWCA, to prevent against vessel negligence under the facts of the instant case. Accordingly, they argue Plaintiff's claims should be dismissed.

## IV. CONTENTIONS OF OPPONENTS

Plaintiff advances two arguments against summary judgment. First, he argues issues of fact exist as to whether the subject stair set was an "appurtenance" of the vessel. In support, he argues ownership is not a dispositive issue as to an item's appurtenance status. Rather, he argues, transportation of the module was the purpose of the Marmac 23's adventure and thus, the module and stair set should be considered appurtenances of

the vessel under *In re Antill*, No. 97-0578, 1998 WL 321512 (E.D. La. Jun. 17, 1998) and related precedent.

Second, Plaintiff challenges the characterization that his claims arise under the LHWCA. He argues fact issues exist as to whether he is properly characterized as a so-called "*Sieracki* seaman*,*" such that he may bring an action for unseaworthiness against the vessel owner, regardless of the traditional limitations on vessel liability afforded under the LHWCA. Essentially, Plaintiff argues a detailed inquiry into the amount of work he performed on the vessel and the character of that work is required to determine whether he qualifies as a *Sieracki* seaman, rather than a LHWCA longshoreman. Plaintiff also seeks leave to file a second amended complaint, ostensibly for purposes of clarifying the assertion of his unseaworthiness claim.

## V. SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the pleadings, depositions, interrogatory answers, and admissions, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). A genuine issue exists if the evidence would allow a reasonable jury to return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986).  Although the Court must consider the evidence with all reasonable inferences in the light most favorable to the nonmoving party, the nonmovant must produce specific facts to demonstrate that a genuine issue exists for trial.  *Webb v. Cardiothoracic Surgery Assocs. of N. Texas*, 139 F.3d 532, 536 (5th Cir. 1998).  The moving party bears the initial responsibility of informing the district court of the basis for its motion.  *Celotex*, 477 U.S. at 323. The movant must point to "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (citing Fed. R. Civ. P. 56). If and when the movant carries this burden, the nonmovant must then go beyond the pleadings and use affidavits, depositions, interrogatory responses, admissions, or other evidence to establish a genuine issue. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[W]here the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial. . . . Only when 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party' is a full trial on the merits warranted." *Lindsey v.*

*Sears Roebuck and Co.*, 16 F.3d 616 (5th Cir. 1994). Accordingly, conclusory rebuttals of the pleadings are insufficient to avoid summary judgment. *Travelers Ins. Co. v. Liljeberg Enter., Inc.*, 7 F.3d 1203, 1207 (5th Cir. 1993).

## VI. APPLICABLE LAW

### A. REMEDIES AVAILABLE TO INJURED MARITIME WORKERS

By way of background, and for purposes of understanding the issues presented by the instant motion, it is necessary to consider the various remedies available to individuals involved in employment in the maritime industry. Such individuals are, by and large, divided into three general categories: (1) seamen, (2) non-seaman maritime workers, and (3) non-maritime workers.[3]

#### 1. Seamen

Seamen traditionally receive the benefit of powerful and generous remedies under general maritime law due to their close relationship with the vessel and the particular hazards of their work.[4] Thus, the seaman injured in the service of the ship has

---

[3] Ensuing discussion is limited to the former two categories, given that Plaintiff's claims – in whatever capacity - are brought invoking the Court's admiralty jurisdiction.

[4] *See, e.g.,* 1 Thomas J. Schoenbaum, Admiralty and Maritime Law § 6-8 (5th ed. 2014)[hereinafter Schoenbaum]("All three remedies are unique to seamen; no other worker in our society can invoke such powerful relief in the event of an industrial accident.") ; *Chandris, Inc. v. Latsis*, 515 U.S. 347, 354, 115 S.Ct. 2172, 2183, 1995 A.M.C. 1840 (1995)("traditional seamen's remedies have been universally recognized as growing out of the status of the seaman and his peculiar relationship to the vessel, and as a feature of the maritime law compensating or offsetting the special hazards and disadvantages to which they who go down to sea in ships are subjected.")(internal quotations and alterations omitted).

three important remedies against his employer: (1) maintenance and cure; (2) a cause of action for unseaworthiness against the vessel; and (3) a cause of action for negligence under the Jones Act, 46 U.S.C. § 688, *et seq*. These remedies are unique to seamen and are tort-based.

### 2. Longshoremen and Other LHWCA Workers

By contrast, the LHWCA provides a federal recovery scheme to a wide range of maritime workers. SCHOENBAUM, *supra,* at § 7-1. The Act was passed primarily to fill a gap created by Supreme Court rulings that application of state workers' compensation schemes to maritime employees is unconstitutional. *Id.* Thus, the statutory framework operates as a traditional workers' compensation scheme under which employers receive immunity from tort liability in exchange for providing no-fault compensation benefits to injured workers.

Importantly, the LHWCA recognizes an exception to this general limitation on injured worker remedies, by affording a statutory cause of action on behalf of a covered worker against vessel third parties under § 905(b).[5] *See* SCHOENBAUM, *supra,* at § 7-10. Under a now-overruled line of cases, the Supreme Court had previously eliminated the bar to tort suits against employers under the LHWCA for longshoremen injured while working on vessels and performing traditional seaman's work. SCHOENBAUM,

---

[5] 33 U.S.C. § 905(b).

*supra*, at § 7-10(citing *Sieracki*, *supra*, 328 U.S. 85). The Court's ruling in *Sieracki* extended the warranty of seaworthiness, which creates a species of absolute liability on behalf of vessel owners to injured workers, in circumvention of the general bar on tort liability under the LHWCA. The Court later concluded that where the injury resulted from the faulty performance of a stevedore, the vessel owner had a right of indemnity against the culpable stevedore in *Ryan v. Stevedoring Co. v. Pan-Atlantic S.S. Corp.*, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956). The undesirable "litigation round-robin" created by these rulings prompted amendment of § 905(b) in 1972 to its current incarnation, under which covered workers retain no cause of action for unseaworthiness, but have certain expanded remedies against third parties. *See* SCHOENBAUM, *supra*, at § 7-10.

### 3. Covered Workers' Remedies against Third Parties

In the modern era, § 905(b) recognizes a limited statutory cause of action on behalf of injured maritime workers against vessel owners for negligence in maritime tort. *See id*. Thus, a threshold inquiry for purposes of § 905(b) is as to the existence of a duty of care owed by vessel owners to workers. The Supreme Court has accordingly defined three such narrow duties. *See Scindia Steam Nav. Co., Ltd. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614 (1981). These are the: (1) "turnover"

duty, (2) "active control" duty, and (3) duty to intervene, discussed *infra*.

As noted above, Congress passed amendments to the LHWCA in 1972 providing that no covered employee may assert a cause of action for unseaworthiness, while concurrently expanding the categories of workers covered by the Act and their remedies under § 905(b). SCHOENBAUM, *supra*, at § 6-27. These amendments effectively created two mutually exclusive categories of maritime workers: seamen and longshoremen. *Id.* The latter have no cause of action for unseaworthiness. *Id.* As to those workers not covered by the LHWCA, but performing work aboard vessels, the weight of authority indicates that the exception created in *Sieracki*, *supra*, allowing such workers to bring unseaworthiness claims, was abolished through passage of the 1972 Amendments to the Act. *See* SCHOENBAUM, *supra*, at § 6-27 (citing, *inter alia*, *Normile v. Maritime Co. of the Philippines*, 643 F.2d 1380, 1981 A.M.C. 2470 (9th Cir. 1981); *Lynn v. Heyl and Patterson, Inc.*, 483 F. Supp. 1247, 1980 A.M.C. 2170 (W.D. Pa. 1980), *aff'd*, 636 F.2d 1209 (3d Cir. 1980); *United States Lines, Inc. v. United States*, 593 F.2d 570, 1979 A.M.C. 1008 (4th Cir. 1979)). Nevertheless, the Fifth Circuit has recognized that workers excluded from LHWCA coverage, but who previously qualified for the *Sieracki* exception, retain their cause of action for unseaworthiness against the vessel owner, absent a clear

indication that Congress intended to deprive them of that otherwise available remedy. *See Aparicio v. Swan Lake*, 643 F.2d 1109 (5th Cir. 1981); SCHOENBAUM, *supra*, at § 6-27.

In light of the above, Defendants' motion presents three questions to the Court. First, whether Plaintiff is a covered worker under § 905(b) of the LHWCA. Second, if so, whether the record indicates Plaintiff would succeed in carrying his burden of establishing a breach of one of the *Scindia* duties. Third, and in the event of a negative answer to the foregoing two inquiries, the question becomes whether Plaintiff can establish his right to bring an action for unseaworthiness under what remains of the *Sieracki* doctrine.

Finally, the Court notes that inquiries regarding classification under the LHWCA require the application of statutory standards to case-specific facts and are ordinarily mixed questions of law and fact. *See New Orleans Depot Servs. Inc. v. Dir., Office of Worker's Comp. Programs*, 718 F.2d 384, 387 (5th Cir. 2013). "However, where, as in this case, the facts are not in dispute, '[LHWCA] coverage is an issue of statutory construction and legislative intent,'" and is treated as a pure question of law. *Id.* (citing *DOWCP v. Perini N. River Assocs.*, 459 U.S. 297, 300,305, 103 S.Ct. 634, 74 L.Ed. 2d 465 (1983)). As noted above, Plaintiff has effectively conceded the lack of any dispute as to the underlying facts. Accordingly, resolution

by summary adjudication of the issues raised by Defendants' motion is proper here.

**B. LHWCA COVERAGE**

**1. Maritime Situs**

Eligibility for benefits under the LHWCA requires satisfaction of the dual maritime "situs" and "status" requirements. *See Coastal Production Servs., Inc. v. Hudson*, 555 F.3d 426, 431 (5th Cir. 2009)(citing *Herb's Welding Inc. v. Gray*, 470 U.S. 414, 415-16 (1985)). Because Plaintiff in the instant case was injured aboard the Marmac 23, while that vessel was present on a navigable waterway, there is no serious question as to satisfaction of the situs element.[6] Accordingly, the pertinent issue is as to Plaintiff's potential maritime "status."

**2. Maritime Status**

The status element requires "that the employee claiming benefits . . . be 'engaged in maritime employment.'" SCHOENBAUM, *supra*, § 3-7 (citing 33 U.S.C. § 902(3)). This includes the specifically enumerated: longshoremen; persons engaged in longshoring operations; and harbor workers, such as ship repairmen, ship builders, and shipbreakers. SCHOENBAUM, *supra*, § 7-

---

[6] *See* 33 U.S.C. § 903(a)(providing for compensation for injuries "occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, . . . or other area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel.")).

2 (citing 33 U.S.C. § 903(a)). It also extends to employees who satisfy the Supreme Court's "broad, functional test of maritime employment, construing the LHWCA to cover any employer whose work contributes to the movement of cargo on navigable waters." *Id.*, at § 7-2 (citing *Chesapeake and Ohio Ry. Co. v. Schwalb*, 493 U.S. 40, 44, 110 S.Ct. 381, 384, 1989 A.M.C. 2965 (1989)).

Prior to the 1972 Amendments to the LHWCA, a worker's injury was only covered if it occurred "*on* the actual 'navigable waters of the United States (including any dry dock).'" *Fontenot v. AWI, Inc.*, 923 F.2d 1127, 1130, 1994 A.M.C. 296 (5th Cir. 1991). Accordingly, the situs component of an injury was effectively the determinative factor as to whether a worker was covered under the LHWCA (provided, of course, that the worker was employed by a statutory "employer.") It was in the wake of the 1972 Amendments, whose passage was meant to expand coverage landward, that the "status" element of a coverage determination was added as an independent and necessary criterion. *See* SCHOENBAUM, *supra*, § 7-2. "For those employees injured on actual navigable waters, the [Supreme] Court recognized that they would have been covered before the 1972 Amendments. Because, the Court reasoned, Congress intended to expand, and not restrict, coverage by the 1972 Amendments, an employee satisfie[s] the status test if the employee was injured 'on the navigable waters in the course of [his] employment as that coverage existed

13

before the 1972 Amendments.'" *Fontenot*, 923 F.2d at 1130(citing *Dir., Office of Workers' Compensation Programs v. Perini N. River Associates*, 459 U.S. at 325, 103 S.Ct. at 651). Accordingly, today, "if the employee was injured while on actual navigable waters, in the course of his employment, then he is engaged in maritime employment and satisfies the status test under *Perini North River Associates*." *Id.*[7] If the employee was not, however, injured on actual navigable waters at the time of the injury, then he is engaged in "maritime employment" (*i.e.*, has maritime status) "only if his work is directly connected to the commerce carried on by a ship or vessel, under *Gray*." *Id.* (citing *Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 105 S.Ct. 1421, 84 L.Ed.2d 406 (1985)).

Because Plaintiff here was injured on navigable waters, and because the record reflects – and no party has contested – that he was so injured in the course of his employment, it is apparent that he satisfies both the situs and status elements of LHWCA coverage. Thus, where the Act otherwise applies by its terms, and as discussed more fully below, Plaintiff bears the burden of proving that he qualifies as a seaman. *See Bernard v. Binnings Const. Co., Inc.*, 741 F.2d 824, 827 (5th Cir.

---

[7] *See also*, SCHOENBAUM, *supra*, § 7-2 ("[A] claimant who would have fallen within the pre-1972 coverage of the Act is covered today without regard to modern status and situs requirements.").

1984)("The burden of establishing seaman status is, of course, on the party claiming the benefits to be derived therefrom.")

**C. *Scindia* duties**

Because Plaintiff qualifies as a covered worker under the LHWCA, his remedy for the injury suffered is generally limited to compensation payments from his employer, non-party Omega. Indeed, the record reflects that Omega reported Plaintiff's accident under the LHWCA and Plaintiff has received LHWCA compensation as a result. *See* (Rec. Doc. 48-2 at 4)(Omega's Report of Injury to U.S. Dep't of Labor); (Rec. Doc. 48-2 at 15)(Plaintiff's Answer to Interrogatory); (Rec. Doc. 48-2 at 27)(Plaintiff's Deposition Testimony). Importantly, receipt of LHWCA benefits does not itself foreclose a Jones Act seaman suit. *See Southwest Marine, Inc. v. Gizoni*, 502 U.S. 81, 91, 112 S.Ct. 486, 493-94, 1992 A.M.C. 305 (1991).

As discussed above, § 905 (b) provides a limited statutory cause of action for injured maritime workers against vessel owners for negligence in maritime tort. Thus, Plaintiff here is entitled to bring claims for maritime negligence against Defendants McDonough Marine and TETRA if he can establish a breach of any of the three *Scindia* duties defined by the Supreme Court.[8] 451 U.S. 156. This, of course, requires that he be able

---

[8] It should be noted that while *Scindia* applies on its face to injuries sustained by longshoremen employed by stevedores, "the rationale of *Scindia* is not limited to stevedoring operations. It clearly applies to any

to satisfy the threshold showing that Defendants owed him any such duties in the first instance.[9] Questions about "the existence or scope of a vessel owner's duties to an independent contractor are questions of law," and are thus appropriate for summary adjudication. *Fontenot v. McCall's Boat Rentals, Inc.*, 227 F.App'x 397, 401 (5th Cir. 2007)(citing *Manuel v. Cameron Offshore Boats, Inc.*, 103 F.3d 31, 33 (5th Cir. 1997)).

### 1. The "Turnover" Duty

The so-called turnover duty refers to the vessel owner's obligation before or at the commencement of the stevedore or independent contractor's operations. *Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 98, 114 S.Ct. 2057, 2063, 1994 A.M.C. 1817 (1994). Pursuant to this duty, a vessel owner must "exercise ordinary care under the circumstances to turn over the ship and its equipment in such a condition" that an independent contractor can carry on operations "with reasonable safety." *See Kirksey v. Tonghai Maritime*, 535 F.3d 388, 392 (5th Cir. 2008). Further, the owner must warn the independent contractor of "latent or hidden dangers which are known to the vessel owner or should have been known to it; however, the duty to warn of

---

independent contractor and its harbor worker employees covered by the LHWCA and working aboard ship." *Hill v. Texaco, Inc.*, 674 F.2d 447, 451, 1984 A.M.C. 1558 (5th Cir. 1982).

[9] In order to recover, the plaintiff must show: (1) that the vessel had a duty to protect against the hazard; (2) breach of that duty; (3) injury; and (4) that the injuries and damages were proximately caused by the negligence of the vessel. SCHOENBAUM, *supra*, at § 7-10.

hidden dangers is narrow. It does not include dangers which are either: (1) open and obvious or (2) dangers a reasonably competent stevedore" or independent contractor should anticipate encountering. *Id.*

Thus, to establish a breach of this duty, a plaintiff must establish that the vessel owner(s) failed to furnish a reasonably safe vessel, equipment and workspace, or "fail[ed] to warn on turning over the ship of hidden defects of which" they should have known. *Randolph v. Laiesz*, 896 F.2d 964, 970 (5th Cir. 1990). Crucially, any allegations concerning breach of the turnover duty must concern the allegedly hazardous condition at the time the independent contractor began operations. *Howlett*, 512 U.S. at 98.

The uncontroverted record evidence reveals that the stair set on which Plaintiff was injured, and which he complains presented an unreasonable risk of harm, was not placed on the Marmac 23 by either Defendant, and further that such stairs were not even physically located on the barge at the time of its arrival at the Omega facility.[10] Accordingly, although Defendants

---

[10] (See Rec. Doc. 38-4 at 69)(Plaintiff's Deposition Testimony):
Q. Okay. You testified earlier that when the barge came in there were no stairs on it, right?
A. Yes.
. . .
Q. Okay. So you've also testified that you don't know who owns the stairs, correct?
. . .
A. I don't know who owned the stairs;

likely owed the turnover duty to Plaintiff under the facts of the instant case, Plaintiff has not shown that he will be able to establish any breach of the turnover duty on the part of Defendants arising out of his injury on the temporary stair set, as is his burden at this summary judgment phase.

## 2. The "Active Control" Duty

A vessel owner "may be liable under *Scindia's* active control duty if it actively involves itself in cargo operations *or* fails to protect contractors from hazards in areas under the active control of the vessel." *Fontenot*, 227 F.App'x at 402. To

---

(Rec. Doc. 48-1 at 4)(Deposition Testimony of Corporate Representative, Millien, of MARMAC/McDonough Marine):
Q. Was your company in control of that barge – in other words, were they directing where it was going, what it was doing – on August 16th of 2013?
A. No.
Q. All right. Who was directing its operation or control – who was in control of the MARMAC 23 on that day?
A. As far as we know, the company that we chartered the barge to – [. . . ] TETRA.;
(Rec. Doc. 48-1 at 21)(Deposition Testimony of Corporate Representative of TETRA):
Q. Okay. Now, does McDonough have any employees that man the barge throughout the period that Tetra Applied Technologies, L.L.C. is the bareboat charterer?
. . .
A. No, sir, not to my knowledge.
Q. Okay. Does Tetra actually man or have employees that man the barge during the charter period?
A. No, sir.;
(Rec. Doc. 48-1 at 32)(Deposition Testimony of Corporate Representative, Bascle, of TETRA):
Q. . . . a Crosby tug took the MARMAC 23, on behalf of TETRA, to the Omega docks, and when they delivered the barge to the Omega docks it was clean and clear of any cargo.
A. That is correct.
. . .
Q. TETRA itself did not have any human beings out there watching the delivery of the POD onto the barge.
A. Not that I'm aware of, no.
. . .
Q. So the barge itself is just basically there, and then employees from Omega then started to do what they needed to do for whatever job you guys were doing for Poseidon.
A. That is correct.

determine whether an area is in the active control of the vessel owner, the Fifth Circuit "generally considers whether the area in question is within the contractor's work area and whether the work area has been 'turned over' to the contractor." *Fontenot*, 227 F.App'x at 403 (citing, *inter alia*, *Fontenot*, 89 F.3d 205, 208 (5th Cir. 1996) (discussing earlier cases and finding no active control where entire vessel was turned over to contractor); *Pimental v. LTD Canadian Pac. Bul*, 965 F.2d 13, 16-17 (5th Cir. 1992)(finding that vessel owner did not have active control over crane where crane was necessary to stevedore's work and was being operated by stevedore); *Masinter*, 867 F.2d 892, 897 (5th Cir. 1989) (finding that vessel owner had active control where owner did not turn over any area of vessel to contractor and where owner admitted in interrogatories that its crew was solely responsible for placement of stairwell where injury occurred); *Theriot*, 783 F.2d 527, 535 (5th Cir. 1986) (finding active control based on district court's finding that owner "continued to control the work area [and] retain[ed] the obligation to clean the keyway deck")).

Here, the record reflects that the Marmac 23 was turned over entirely to Omega when it arrived at that entity's facility.[11] There is no indication that any of Defendants' personnel were present on-site while work on the module was

---

[11] See excerpted deposition testimony, *supra*.

performed, let alone that any employee of Defendants exercised any degree of control over the operations of the contractors performing work on the vessel at that juncture. In fact, the vessel appears to have been delivered to the Omega facility for loading by a third-party contractor, non-party Crosby. (See Rec. Doc. 48-1 at 32). Plaintiff submits no evidence to the contrary and has made showing that he can carry his burden of proving a breach of the active control duty.

### 3. The Duty to Intervene

The duty to intervene to protect longshoremen from dangers that arise during the course of their work "is a narrow one." *Fontenot*, 227 F.App'x at 404 (quoting *Futo v. Lykes Bros. S.S. Co.*, 742 F.2d 209, 216 (5th Cir. 1984). Establishing the duty requires the plaintiff to show not only actual knowledge of the dangerous condition, but also "something more." *See Futo*, 742 F.2d at 1215; *Greenwood v. Societe Francaise De*, 111 F. 3d 1239, 1249 (5th Cir. 1997). This something more requires a showing that the vessel owner also had: "(1) actual knowledge that the [defect] posed an unreasonable risk of harm and (2) actual knowledge that it could not rely on the [independent contractor] to protect its employees and that if unremedied the condition posed a substantial risk of injury." *Greenwood*, 111 F.3d at 1248.

Nothing in the record suggests that any representative of either Defendant had actual knowledge of the stair set's placement on the Marmac 23, not to mention the existence of any potential danger presented thereby. Plaintiff makes no arguments, and cites no evidence, to the contrary and therefore cannot establish a breach of the duty to intervene. Moreover, "*Scindia's* duty to intervene 'does not . . . extend to an open and obvious transitory condition . . . that is created entirely by the independent contractor, is under its control, and relates wholly to its own gear and operations." *Fontenot*, 227 F.App'x at 405 (quoting *Futo*, 742 F.2d at 216).

In light of the foregoing, the record evidence and undisputed facts show that Plaintiff cannot prove a breach of any of the three limited *Scindia* duties owed by vessel owners to third-party workers covered by the LHWCA. Accordingly, his sole potential remedy against Defendants herein exists only if he succeeds in establishing "*Sieracki* seaman" status for purposes of an unseaworthiness claim.

### D. "*Sieracki* Seaman" Status

As discussed above, Plaintiff argues issues of fact prevent summary judgment on the issue of whether he qualifies as a so-called "*Sieracki* seaman" under the exception to the limitation on vessel owner liability initially recognized by the Supreme Court in *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 94-95

(1946). As discussed, *supra*, the *Sieracki* doctrine extended the vessel owner's warranty of seaworthiness to longshoremen injured while performing traditional seaman's work aboard a vessel. It therefore permitted such workers to bring unseaworthiness claims directly against vessel owners, thereby circumventing the general limitation of liability created by application of the LHWCA. As additionally noted above, "[t]he weight of authority has concluded that the doctrine of "*Sieracki* seaman" has been abolished, not only for workers subject to the Longshore Act, but for other longshore and harbor workers as well." SCHOENBAUM, *supra*, at § 6-27. Nevertheless, the Fifth Circuit has held that persons excluded from coverage by the LHWCA and performing traditional seaman's duties aboard vessels may qualify as "*Sieracki* seamen" for the warranty of seaworthiness, unless and until Congress abolishes such remedy. *See Aparicio v. Swan Lake*, 643 F.2d 1109 (5th Cir. 1981). Indeed, it is this latter case upon which Plaintiff relies to argue the issue of his potential seaman status prevents summary judgment here. The Court finds, however, that *Aparicio* is too slender a reed to bear the weight Plaintiff's argument would afford it.

As discussed above, the Court has already concluded that Plaintiff is covered by the LHWCA. He is therefore governed by that Act's limitations on actions against third-party vessel owners. *Aparicio* is distinguishable from the instant case for

two material reasons. First, the line-handler asserting an unseaworthiness claim in that case was a federal worker and was thus *expressly* excluded from coverage under the LHWCA. 643 F.2d at 1115. Second, the injury occurred in the Panama Canal Zone and therefore not on the "navigable waters of the United States" for purposes of maritime situs. *Id.* It was these elements that led the *Aparicio* court to hold: "under circumstances in which the maritime worker is not covered by the LHWCA, the FECA employee may invoke the Sieracki unseaworthiness action against the vessel owner . . . ." *Id.* at 1118. Their absence here, where Plaintiff was injured on the navigable waters of the United States in the course of his employment, which subjects him to coverage by the LHWCA under *Perini* and related progeny, precludes his claim of *Sieracki* seaman status.

**E. Appurtenance Theory**

The Court writes finally, and briefly, to address Plaintiff's claim that fact issues prevent summary judgment on the issue of whether the subject stair set was an "appurtenance" of the Marmac 23. Appurtenance status is only relevant if Plaintiff is entitled to bring a cause of action for unseaworthiness, which requires him to allege "his injury was caused by a defective condition of the ship, its equipment or appurtenances." SCHOENBAUM, *supra*, at § 6-25. As noted above, because Plaintiff is not a seaman under the traditional or

23

"*Sieracki*" definition of that term, he has no unseaworthiness claim. Even if he did, the absence of any indication of privity of ownership between the vessel and the stair set (or even any connection between Defendants and the stair set) prevents a finding of appurtenance status here. Plaintiff relies on *In re Antill Pipeline Const. Co., Inc.*, No. 97-0578, 1998 WL 321512 (E.D. La. Jun. 17, 1998), for the proposition that the relevant inquiry into appurtenance status focuses on whether the item in question served the purpose of the vessel's mission, irrespective of privity of ownership. In so doing, Plaintiff conveniently omits a material phrase from the proposition quoted, which reads, *in extenso*: "Appurtenances are those items ***belonging to the owner of the vessel*** which were on board for the voyage and were part of what the owner risked on the vessel for purposes of the adventure." *Id.*, at \*3 (citing *In re Waterman S.S. Corp.*, 794 F. Supp. 601, 605 (E.D. La. 1992); *In re Pacific Far East Line, Inc.*, 314 F. Supp. 1339, 1350 (N.D. Cal. 1970), *aff'd*, 472 F.2d 1382 (9th Cir. 1973))(emphasis added). Accordingly, his argument is without merit. (Though the issue of whether an item is an appurtenance of a vessel is largely immaterial here, where the Court has already concluded that Plaintiff is a worker covered by the LHWCA and barred from *Sieracki* seaman status.)

In light of the foregoing, **IT IS ORDERED** that Defendants'
Motion for Summary Judgment (Rec. Doc. 38) is **GRANTED.**

**F. Leave to Amend**

Simultaneously with the filing of his opposition to
Defendants' motion for summary judgment, Plaintiff filed for
leave to file a Second Amended Complaint, ostensibly for
purposes of clarifying his (now) asserted unseaworthiness claim.
(See Rec. Doc. 43). This motion comes approximately five weeks
before trial, well after the close of discovery, and Plaintiff
makes effectively no argument in support of good cause for
seeking leave to amend, or why he could not have asserted his
unseaworthiness claim/seaman status earlier.

Plaintiff's initial Complaint was filed on April 8, 2014,
naming Marmac LLC and McDonough Marine Service as defendants.
(Rec. Doc. 1). That Complaint included allegations of
negligence, without any mention of seaman status or any claim of
unseaworthiness. (Rec. Doc. 1).

The Court issued a first Scheduling Order on July 11, 2014,
setting the deadline for amending pleadings on September 8,
2014. (Rec. Doc. 8). Defendant McDonough sought, and the Court
granted, an extension to October 8, 2014 of that deadline. (Rec.
Docs. 13, 15). Still, Plaintiff sought and was granted leave to
file a First Amended Complaint on the original September 8
deadline, which pleading added Defendant TETRA. (Rec. Doc. 14).

That pleading further omitted references to unseaworthiness or seaman status.

This matter was administratively closed on November 14, 2014. (Rec. Doc. 24). It was re-opened on February 19, 2015. (Rec. Doc. 27). The Court issued a final Scheduling Order, setting trial for July 13, 2015, and providing a deadline for completing discovery of May 26, 2015. (Rec. Doc. 30). That Scheduling Order included no reference to deadlines for further amendment of pleadings, given that the initial deadlines had long passed.

Defendants filed the instant motion for summary judgment on May 12, 2015. (Rec. Doc. 38). Plaintiff moved to continue the submission date for that motion to June 10, 2015, which motion was granted, with an opposition deadline of June 8, 2015. (Rec. Docs. 39, 40). Plaintiff filed his opposition on June 8, and simultaneously moved for leave to amend his Complaint.

Despite Plaintiff's arguments to the contrary, his motion for leave to amend here is governed by Fed. R. Civ. P. 16(b), because the Court previously issued a scheduling order fixing deadlines for same. Accordingly, the scheduling order "shall not be modified except upon a showing of good cause." *See S&W Enters., L.L.C. v. Southtrust Bank of Alabama*, 315 F.3d 533, 535 (5th Cir. 2003). Good cause requires the "party seeking relief to show that the deadlines cannot reasonably be met despite the

diligence of the party needing the extension." 6A CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 1522.1 (2d ed. 1990).

In support of his motion, Plaintiff argues recently discovered facts obtained from depositions raise issues as to his potential seaman status. The record reflects that all depositions were completed by November 2014. (Rec. Doc. 50). Further, there has never been any question (particularly not on the part of Plaintiff or his counsel) as to the status of his employment by Omega at the time of the subject incident. Plaintiff offers no explanation as to what prevented discovery of any allegedly "new" facts between November 2014 and the close of discovery in May 2015 (let alone the filing of his instant motion for leave to amend). The potential prejudice to Defendants of permitting amendment of Plaintiff's complaint on what is effectively the eve of trial is clear. The necessary inference raised by the tardiness of such filing is that it is merely an attempted end-run around summary judgment through artificial injection of so-called fact issues at this late juncture. Moreover, it would be a futile gesture to allow the amendment in view of earlier findings here contra seaman status.

**VIII. CONCLUSION**

For the reasons set forth above, Plaintiff has failed to establish, in a manner sufficient to prevent summary judgment, the possibility of his establishing breach of any of the *Scindia* duties or his status as a *Sieracki* seaman. Accordingly, Defendants are entitled to summary judgment dismissing Plaintiff's claims in this matter; **IT IS ORDERED THAT** their Motion for Summary Judgment (Rec. Doc. 38) is **GRANTED.**

Plaintiff has further failed to articulate good cause warranting leave to file a Second Amended Complaint at this juncture (and serious questions remain as to the futility of such in light of stated reasons above). Accordingly, **IT IS ORDERED** that Plaintiff's Motion for Leave to File Second Amended Complaint (Rec. Doc. 43) is **DENIED.**

New Orleans, Louisiana, this 18th day of June, 2015.


UNITED STATES DISTRICT JUDGE